Dr. Hercules Panayiotou appeals the order of the Mobile Circuit Court denying his motion for a summary judgment in the medical-malpractice action filed against him by Jamie Sullivan Johnson, as administratrix of the estate of Mae Sullivan, deceased. We reverse and remand.
 I.
On March 7, 2002, Dr. Panayiotou performed a heart-catheterization procedure on Mae Sullivan at the Mobile Infirmary Medical Center. During the course of the procedure, a coronary artery ruptured. Emergency coronary artery bypass surgery was performed; however, Sullivan died on March 9, 2002.
On March 8, 2004, Johnson sued Dr. Panayiotou, Mobile Infirmary Medical Center, and Dr. Panayiotou's medical practice, IMC Diagnostic Medical Clinic, P.C., in the Mobile Circuit Court, alleging medical malpractice.[1] On May 11, 2007, Dr. Panayiotou moved for a summary judgment arguing that Johnson could not establish, by substantial evidence, that he had breached the appropriate standard of care during his treatment of Sullivan. Specifically, Dr. Panayiotou argued that because Johnson's action was governed by the Alabama Medical Liability Act, § 6-5-540 et seq., Ala. Code 1975 ("the AMLA"), Johnson was required to present expert testimony from a "similarly situated health care provider" to establish a breach of the standard of care. See Holcomb v. Carraway,945 So.2d 1009, 1012 (Ala. 2006) (stating that a plaintiff ordinarily must present expert testimony to establish that a defendant health-care provider failed to meet the standard of care; however, "such expert testimony is allowed only from a "similarly situated health care provider'"). Dr. Panayiotou further argued that the only expert witness identified by Johnson, Dr. Jay N. Schapira, was not a "similarly situated health care provider" as that term *Page 873 
is defined in § 6-5-548(c) because, he says, while Dr. Panayiotou was certified by the American Board of Internal Medicine ("ABIM") in internal medicine, cardiovascular disease, and interventional cardiology, Dr. Schapira was certified by ABIM in only internal medicine and cardiovascular disease.[2]
Therefore, Dr. Panayiotou argued, because it was undisputed that he was practicing interventional cardiology when he performed the heart-catheterization procedure on Sullivan, Dr. Schapira was not a similarly situated health-care provider eligible to provide expert testimony regarding the standard of care. In conjunction with his motion for a summary judgment, Dr. Panayiotou submitted an excerpt of his own deposition in which he stated that he received his "interventional cardiology certification the first time [the examination] was ever given in 1999" and a copy of his curriculum vitae showing, under a heading listing the examinations he had passed:
 "ABIM: Internal Medicine, 25 September 1991
 "ABIM: Cardiovascular Subspecialty, November 1993 "ABIM: Interventional Cardiology, November 1999."
On June 14, 2007, Johnson filed her response to Dr. Panayiotou's summary judgment motion, arguing that § 6-5-548(c) requires only that an expert witness be certified in the same "specialty" as the defendant to be considered a similarly situated health-care provider and that Dr. Panayiotou and Dr. Schapira are in fact both certified in the same specialty — internal medicine. Cardiovascular disease, she argues, is actually a "subspecialty" of internal medicine, and interventional cardiology is, at best, she argues, another "subspecialty" of internal medicine. However, she argues, interventional cardiology is more properly viewed as a subspecialty of cardiovascular disease and thus a "sub-specialty" of internal medicine.
Johnson also argued that, although Dr. Panayiotou held an ABIM-issued "certificate of added qualification" in interventional cardiology at the time he performed the heart catheterization on Sullivan, ABIM did not formally recognize interventional cardiology as a subspecialty of cardiovascular disease until July 2006. In support of her argument, she submitted printed copies of pages from the Web sites of both ABIM and the American Board of Medical Specialties ("ABMS") indicating that, on July 14, 2006, ABIM, in an attempt to standardize the way it recognized subspecialties, announced that it now recognized all certificates of added qualifications as subspecialties of internal medicine.[3] Johnson *Page 874 
also submitted an affidavit from Dr. Schapira in which he stated that
 "Dr. Panayiotou was not board certified in the specialty or subspecialty of interventional cardiology at the time of the incident made the basis of this suit (March 9, 2002), but rather had a `certificate of added qualification' that was not recognized as either a specialty or a subspecialty by [ABMS] . . . until July of 2006 when [ABIM] reclassified the `certificate of added qualification' in interventional cardiology as a subspecialty of cardiology."
Finally, Johnson also submitted a copy of Dr. Panayiotou's curriculum vitae and noted that it specifically designated the examination he passed in November 1993 as being for the "Cardiovascular Subspecialty" (emphasis added), but the November 1999 examination was merely listed as being for "interventional cardiology" with any description of that practice as a sub-specialty conspicuously absent.[4]
After receiving Johnson's motion opposing his summary-judgment motion, Dr. Panayiotou filed, on June 18, 2007, a motion asking the trial court to strike Dr. Schapira's affidavit on the ground that it contradicted his previous sworn testimony.[5]
See Wilson v. Teng, 786 So.2d 485, 497 (Ala. 2000) ("This Court has held that `a party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment.'" (quoting Continental Eagle Corp. v.Mokrzycki 611 So.2d 313, 317 (Ala. 1992))). The next day, June 19, 2007, Dr. Panayiotou filed another motion asking the trial court also to strike the printed copies of pages taken from ABMS and ABIM's respective Web sites on the ground that the documents were unsworn, uncertified, unauthenticated, and, therefore, inadmissible. See Carter v. Cantrell MackCo., 662 So.2d 891, 893 (Ala. 1995) ("The documents were not properly authenticated and, thus, they were inadmissible hearsay, which cannot be relied on to defeat a properly supported motion for a summary judgment."). Dr. Panayiotou simultaneously submitted a personal affidavit in which he made the following statements:
 "2. I am a physician duly licensed to practice medicine in the State of Alabama and was so licensed at the relevant times. I am certified by [ABIM.] as a specialist in Internal Medicine, Cardiology *Page 875 
and Interventional Cardiology and was so certified at the relevant times.
 "3. [ABIM] formally recognized certification in the subspecialty of Interventional Cardiology in 1999. In 1999, as part of the certification process in Interventional Cardiology, I submitted verified data to the Board stating that I had successfully accomplished the appropriate number of interventional cardiology procedures to enable me to take the examination for certification in Interventional Cardiology.
 "4. As a result of passing this examination, [ABIM] certified me as a specialist in the subspecialty of Interventional Cardiology.
 "5. By meeting the certification requirements of [ABIM], beginning in 1999 I was allowed to represent to the public that I am board-certified in the subspecialty of Interventional Cardiology."
On June 21, 2007, Dr. Panayiotou submitted two additional affidavits. In the first, ABIM official Joan Otto swore that "[ABIM] recognized certification in Interventional Cardiology in 1999" and that "Dr. Panayiotou was certified by [ABIM] in Interventional Cardiology in 1999." In the second, Amy A. Mosser, vice president of administration and operations for ABMS, swore as follows:
 "5. ABMS approved the certification process for Interventional Cardiology in 1996 and began recognizing certification in this subspecialty in 1999, when the first certifying examination was offered by the ABIM.
 "6. ABIM, like other Member Boards, originally designated its board certification for subspecialties as a `certificate of added qualifications.' This was in conformity with general ABMS practice at that time. Subsequently, ABMS decided to transition away from such language. The ABMS Bylaws in effect in 2002 required future applications for subspecialty certificates to be designated as subspecialty certificates, but gave the Member Boards discretion to continue designating existing subspecialty certificates as certificates of added qualifications or special qualifications or to discontinue those terms and simply use the subspecialty designation. These differences in terminology are just that, however, and have no substantive effect on ABMS's recognition of certification. ABMS has continually recognized ABIM certification in the subspecialty of Interventional Cardiology since its inception in 1999."
On August 15, 2007, the trial court denied Dr. Panayiotou's motion for a summary judgment, holding that Dr. Schapira was a similarly situated health-care provider "regardless of [his] lack of sub-subspecialty certification" and without addressing whether Dr. Panayiotou was actually certified as a specialist in interventional cardiology in March 2002 when he performed the heart catheterization on Sullivan. The trial court simultaneously entered an order granting Dr. Panayiotou's "motion to strike" without specifying whether it intended to grant the June 18 motion to strike, the June 19 motion to strike, or both.
Dr. Panayiotou subsequently moved the trial court to certify its order denying his motion for a summary judgment for a permissive appeal pursuant to Rule 5, Ala. R.App. P., and, on September 7, 2007, the trial court did so. On September 21, 2007, Dr. Panayiotou petitioned this Court for permission to appeal. We granted that petition on November 1, 2007.
 II. "`We apply the same standard of review [in reviewing the grant or denial *Page 876 
of a summary-judgment motion] as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53
(Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12.'"
Mutual Assurance, Inc. v. Schulte, 970 So.2d 292, 295
(Ala. 2007) (quoting Dow v. Alabama Democratic Party,897 So.2d 1035, 1038-39 (Ala. 2004)).
 III.
This appeal presents two issue for this Court to consider: (1) what is the meaning of the term "specialty" as used in § 6-5-548(c); and (2) was Dr. Panayiotou certified by ABIM as a specialist in interventional cardiology at the time he allegedly breached the standard of care in March 2002.
The legislature has defined a similarly situated health-care provider as a health-care provider that is "certified by an appropriate American board in the same specialty" as the defendant health-care provider.[6] § 6-5-548(c)(3) (emphasis added). Dr. Panayiotou argues that a "specialty" for the purposes of § 6-5-548(c) is any specialized area of medicine in which a medical board offers certification and that, because ABIM offers certification in interventional cardiology, that area is therefore a "specialty" for purposes of § 6-5-548. Johnson, however, argues that an area of medicine is a "specialty" only if it is specifically designated by a medical board as a "specialty"; hence, she argues, because ABIM officially designates interventional cardiology as a "subspecialty," it is not a "specialty" for § 6-5-548
purposes.
We agree with Dr. Panayiotou that a specialty is any specialized area of medicine in which an American medical board offers certification. There is no indication in the AMLA that the legislature intended to define the term "specialty" based upon the taxonomic scheme used by ABIM, ABMS, or any other professional medical board.[7] That any appropriate American medical board offers certification in an area of medicine is itself evidence that that area of medicine is a specialty.
The interpretation of the term "specialty" advocated by Johnson, if adopted, would be problematic in its application because it fails to recognize that some areas of medicine may technically be deemed "subspecialties" by some boards, but recognized as specialties by others. For example, inChapman v. Smith, 893 So.2d 293 (Ala. 2004), this Court recognized that the defendant anesthesiologist was certified in the specialty field of pain management by the American Academy of Pain Management ("AAPM"), a non-ABMS *Page 877 
board.[8] ABMS does not recognize pain management as a "specialty" under its taxonomic scheme; however, the relevant ABMS board, the American Board of Anesthesiology, does recognize "pain medicine" as a "subspecialty." Thus, applying the argument advanced by Johnson, whether a board-certified anesthesiologist practicing in the pain-management/pain-medicine field was a specialist in that field would hinge on whether the anesthesiologist's certificate was issued by AAPM, in which case he would be recognized by our courts as a specialist, or by the American Board of Anesthesiology, in which case he would not be recognized as a specialist" even though both boards apparently agree that the field is a unique area of medicine and recognize it as such. The only difference is that the field is deemed a "subspecialty" in the ABMS hierarchy. Whether an area of medicine is a "specialty" for purposes of § 6-5-548 should not change depending on which board has certified the particular health-care provider in that specialty.
Moreover, if we were to adopt Johnson's argument relying on the taxonomic designations used by ABIM and ABMS, it would pave the way for a gastroenterologist, an endocrinologist, or a nephrologist, all of whom practice in an area recognized as a "subspecialty" by ABIM, to testify as a similarly situated health-care provider against a cardiologist merely because they were all certified by ABIM in the "specialty" of internal medicine — regardless of the fact that their expertise is in the digestive system, the endocrine system, and the kidneys, respectively, and that they might have had minimal experience with medical issues related to the heart. This is precisely the situation § 6-5-548 was enacted to prevent. Thus, we now explicitly hold that if an appropriate American medical board recognizes an area of medicine as a distinct field and certifies health-care providers in that field, that area is a specialty for purposes of § 6-5-548.
We note that the Supreme Court of Michigan reached a similar conclusion when it considered this issue. In Woodard v.Custer, 476 Mich. 545, 719 N.W.2d 842 (2006), that court considered the definition of "specialty" as the term is used in Mich. Comp. Laws § 600.2169, which states, in relevant part:
 "(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
 "(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty."
Referring to Borland's Illustrated Medical Dictionary
(28th ed.), the Woodard court concluded:
 "[A]`specialty' is a particular branch of medicine or surgery in which one can potentially become board certified.
 ". . . Moreover, `sub' is defined as `a prefix . . . with the meanings "under," "below," "beneath". . ."secondary," "at *Page 878 
a lower point in a hierarchy[.]"' Random House Webster's College Dictionary (1997). Therefore, a `subspecialty' is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a sub-specialty, the plaintiffs expert witness must have specialized in the same sub-specialty as the defendant physician at the time of the occurrence that is the basis for the action".
476 Mich. at 561-62, 719 N.W.2d at 851 (emphasis added). The court also noted in a footnote that ABMS had filed an amicus curiae brief in which it agreed that a sub-specialty constitutes a specialty. 476 Mich. at 562 n. 6,719 N.W.2d at 851 n. 6.
 IV.
Having held that interventional cardiology is a recognized specialty, we must now address whether in fact Dr. Panayiotou was certified in that specialty at the time of the alleged breach of the standard of care. Dr. Panayiotou alleges that he was; Johnson alleges he was not. In conjunction with his motion for a summary judgment, Dr. Panayiotou submitted evidence, summarized above, sufficient to make a prima facie showing that he was board-certified in interventional cardiology at the time of the alleged breach of the standard of care in March 2002; thus, the burden then shifted to Johnson to produce substantial evidence showing that Dr. Panayiotou was not
board-certified in interventional cardiology in March 2002. Johnson has failed to meet that burden.
The evidence Johnson submitted in an attempt to meet her burden included: (1) printed copies of pages from the Web sites of both ABIM and ABMS; (2) an affidavit from Dr. Schapira; and (3) Dr. Panayiotou's curriculum vitae.[9] Dr. Panayiotou filed separate motions to strike both the printed copies of the pages from the Web sites and Dr. Schapira's affidavit, and the trial court subsequently entered an order granting a motion to strike without stating which motion to strike it was granting. Dr. Panayiotou's position is that the trial court's order granted both motions to strike, while Johnson alleges it is unclear what motion or motions the trial court intended to strike. Regardless of the trial court's intent, however, the evidence submitted by Johnson was insufficient to rebut Dr. Panayiotou's prima facie showing that he was board-certified in interventional cardiology at the time he allegedly breached the standard of care in March 2002.
We first note that the printed copies of pages from the ABIM and ABMS Web sites submitted by Johnson "were not *Page 879 
properly authenticated and, thus, they were inadmissible hearsay, which cannot be relied on to defeat a properly supported motion for a summary judgment." Carter,662 So.2d at 893. Accordingly, we will not consider that evidence on appeal, regardless of whether the trial court actually struck it. See Chatham v. CSX Transp., Inc.,613 So.2d 341, 346 (Ala. 1993) (stating that this Court "may not consider" inadmissible evidence that a party properly moved to strike). Citing Wilson, supra, Dr. Panayiotou also urges us not to consider Dr. Schapira's affidavit, which directly contradicted his deposition testimony. However, the so-called "sham affidavit doctrine" applied by this Court inWilson, which prevents an individual from contradicting prior sworn testimony to avoid the entry of a summary judgment, has, to date, been applied only against actual parties in Alabama, and Dr. Schapira is an expert witness, not a party. See Champ Lyons, Jr. Ally W. Howell, Alabama Rules of Civil Procedure Annotated
§ 56.7 (4th ed. 2004) ("Strong dictum in Tittle v.Alabama Power Co., 570 So.2d 601 (Ala. 1990) suggests that the rule preventing a party from contradicting an earlier deposition by affidavit for purposes of avoidance of the entry of summary judgment does not apply to prevent such activity when the deponent is a non-party."). While one law review article has noted that other courts to consider the issue have "generally agreed that [the sham-affidavit doctrine] applies to the contradictory testimony of expert witnesses," Applyingthe Sham Affidavit Doctrine in Arizona, 38 Ariz. St. L.J. 995, 1048 (Winter 2006) (footnotes omitted), and one court has noted that "[it] can think of no reason, however, not to apply this rule to the present case involving the testimony and affidavit of the plaintiff's sole expert witness," AdelmanTremblay v. Jewel Cos., 859 F.2d 517, 521 (7th Cir. 1988), we need not address that issue at this time because, even if we considered the affidavit, we would have to conclude that Johnson failed to create a genuine issue of fact regarding whether Dr. Panayiotou was board-certified in interventional cardiology in March 2002.
In his affidavit, Dr. Schapira declared that Dr. Panayiotou was not board certified in interventional cardiology in March 2002 because, at that time, Dr. Panayiotou held only a "certificate of added qualification." Johnson argues that Dr. Schapira's statement is further supported by Dr. Panayiotou's own curriculum vitae, which omits the word "subspecialty" next to "Interventional Cardiology" in the list of examinations passed by Dr. Panayiotou, but explicitly lists "CardiovascularSubspecialty" (emphasis added) in that same list, thus indicating, Johnson argues, that even Dr. Panayiotou recognized that interventional cardiology was not a "subspecialty" in 1999 when he passed the examination.
However, Johnson's argument was directly refuted by an ABMS official, who, in an affidavit submitted by Dr. Panayiotou, explained that there was no substantive difference between a certificate of added qualification and certification in a subspecialty, and that "ABMS has continually recognized ABIM certification in the sub-specialty of Interventional Cardiology since its inception in 1999." In light of this definitive evidence on this point, we can say as a matter of law that the certificate of added qualification Dr. Panayiotou held in interventional cardiology in March 2002 was the equivalent of subspecialty certification and that he was accordingly a board-certified specialist in interventional cardiology at that time.
We further note that the Michigan Supreme Court, inWoodard, did not have to directly consider this issue; however, a concurring Justice nevertheless did so and similarly concluded that there was no functional *Page 880 
difference between a certificate of added qualification and board certification, stating:
 "As we did above with regard to the `specialty' versus `subspecialty' dispute, it is again necessary for us to resolve a question that arises in most cases as a result of nomenclature often used to distinguish between certifications offered for broad specialty areas and certifications offered for the narrower subspecialty areas. Specifically, certifications coinciding with the broader specialty areas are often referred to by parties and in case law as board certifications, while certifications coinciding with the narrower specialty areas are referred to as `certificates of special qualifications' or `certificates of added qualifications.' The result is that in many cases, such as Woodard, plaintiffs will argue that certificates of special qualifications are not board certifications that need to be matched. We clarify, however, that under the above definition of the phrase `board certified,' any difference between what are traditionally referred to as board certifications and what have commonly been called certificates of special qualifications is merely one of semantics. When a certificate of special qualifications is a credential bestowed by a national, independent medical board indicating proficiency in a medical specialty, it is itself a board certification that must be matched."
476 Mich. 545, 613, 719 N.W.2d 842, 878 (Taylor, C.J., concurring in the result) (emphasis added).
 V.
Dr. Panayiotou moved the trial court to enter a summary judgment in his favor in the medical-malpractice action filed against him by Johnson, alleging that she had failed to identify a similarly situated health-care provider who would testify that he had breached the standard of care in his treatment of Sullivan. The trial court denied his motion, holding that the expert identified by Johnson, Dr. Schapira, was in fact similarly situated to Dr. Panayiotou because they were both board-certified by ABIM in internal medicine. However, because Dr. Panayiotou put forth evidence indicating that he was also board-certified by ABIM in interventional cardiology when the alleged malpractice occurred and that Dr. Schapira did not hold that certification, the trial court erred in holding that Dr. Panayiotou and Dr. Schapira were similarly situated health-care providers. Accordingly, the order of the trial court denying Dr. Panayiotou's motion for a summary judgment is reversed, and this cause is remanded for the trial court to enter a summary judgment for Dr. Panayiotou.
REVERSED AND REMANDED.
SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
COBB, C.J., concurs in part and dissents in part.
MURDOCK, J., dissents.
COBB, Chief Justice (concurring in part and dissenting in part).
The majority opinion presents a new rationale for defining the term "specialty" as applied to similarly situated health-care providers under Ala. Code 1975, § 6-5-548. Although I do not disagree with this rationale and I concur in its adoption, I do not believe that it is appropriate to apply it to this case. In this case, and under the state of the law at the time the trial court found that Dr. Panayiotou and Dr. Schapira were similarly situated health-care providers, the trial court was correct. The record shows that, in the context of the medical procedure in question, Dr. Schapira *Page 881 
had experience similar to or greater than Dr. Panayiotou. Under these circumstances, I believe that it would be more just to apply the new construction of § 6-5-548 as adopted by the majority prospectively, rather than retroactively. See, e.g., Ex parte F.P., 857 So.2d 125 (Ala. 2003);City of Daphne v. City of Spanish Fort, 853 So.2d 933
(Ala. 2003); and Ex parte Bonner, 676 So.2d 925
(Ala. 1995) (cases supporting the general rule that statutes should be construed prospectively and not retrospectively in the absence of a particular indication of legislative intent to apply statute retrospectively).
[1] Mobile Infirmary Medical Center and IMC Diagnostic 
Medical Clinic, P.C., were later dismissed from the case.
[2] Section 6-5-548(c) provides:
"(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following requirements:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
 "(2) Is trained and experienced in the same specialty.
 "(3) Is certified by an appropriate American board in the same specialty.
 "(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."
(Emphasis added.)
[3] ABMS is an umbrella organization that oversees 24 specialty boards, including ABIM, and establishes standards for specialty certification. The other boards governed by ABMS include the American Board of Allergy Immunology, the American Board of Anesthesiology, the American Board of Colon Rectal Surgery, the American Board of Dermatology, the American Board of Emergency Medicine, the American Board of Family Medicine, the American Board of Medical Genetics, the American Board of Neurological Surgery, the American Board of Nuclear Medicine, the American Board of Obstetrics 
Gynecology, the American Board of Ophthalmology, the American Board of Orthopaedic Surgery, the American Board of Otolaryngology, the American Board of Pathology, the American Board of Pediatrics, the American Board of Physical Medicine Rehabilitation, the American Board of Plastic Surgery, the American Board of Preventive Medicine, the American Board of Psychiatry Neurology, the American Board of Radiology, the American Board of Surgery, the American Board of Thoracic Surgery, and the American Board of Urology.
[4] In court filings contained in the supplemental record, Johnson indicated that, at a June 19, 2007, hearing on Dr. Panayiotou's summary-judgment motion, she also proffered as evidence a printed copy of e-mail correspondence her counsel had engaged in with Joan Otto, senior credentials manager for ABIM, on the topic of certificates of added qualifications and subspecialties. However, she acknowledged in her motion to supplement the record that the trial court rejected the proffer as not being in the proper form, apparently because it was unauthenticated.
[5] During his deposition, Dr. Schapira testified that interventional cardiology had been a sub-specialty of internal medicine "[s]ince 1999 or 2000" and that the interventional cardiology board "started in 1999, 2000."
[6] This presupposes that the defendant healthcare provider is certified by an appropriate board as a specialist; if not, § 6-5-548(b) governs instead of § 6-5-548(c), and there is no such requirement.
[7] Eighteen of the specialty boards governed by ABMS, including ABIM, offer certification in specialized areas of medicine that they officially designate as "subspecialties."
[8] The defendant physician in Chapman was also board-certified in anesthesiology, although the opinion does not identify the board that issued that certification.893 So.2d at 296.
[9] After the trial court denied Dr. Panayiotou's motion for a summary judgment and after we granted his subsequent petition to file an immediate permissive appeal of that ruling, Johnson obtained a new affidavit from ABIM official Joan Otto and moved the trial court to supplement the record to include that affidavit. Dr. Panayiotou objected, arguing that Rule 10(f), Ala. R.App. P., does not allow the record on appeal to be supplemented to include evidence that was not in the record at the trial court level. The trial court nevertheless granted Johnson's motion to supplement, and the new affidavit was added to the record. Dr. Panayiotou has since moved this Court to strike the supplement to the record, and that motion has been granted. See Cowen v. M.S. Enters., Inc.,642 So.2d 453, 455 (Ala. 1994) ("Rule 10(f) provides for the supplementation of the record only to include matters that were in evidence in the trial court. That rule was not intended to allow the inclusion of material in the record on appeal that had not been before the trial court.").