On Application for Rehearing

MURDOCK, Justice.
The opinion of August 12, 2011, is withdrawn and the following is substituted therefor.
The Industrial Development Board of the City of Montgomery (“the IDB”) appeals, pursuant to Rule 5, Ala. R.App. P., from the Montgomery Circuit Court’s interlocutory order denying its motion for a summary judgment as to the breach-of-contract claims asserted against it by George Earl Russell and Thomas E. Russell, as coexecutors and cotrustees of the wills and testamentary trusts of Earnest W. Russell and Myrtis Russell (“the Rus-sells”) (case no. CV-04-3282), and by Price McLemore, Mary H. McLemore, *129 John Mclnnis, Jr., Timothy N. Mclnnis, Charles R. Mclnnis, William S.- Newell, and the Peoples Bank and Trust Company, as trustee for the Adaline Hooper Trust A and B (“the McLemore group”) (case no. CV-05-1728) (the plaintiffs in both eases are hereinafter collectively referred to as “McLemore/Russell”). We affirm the order of the trial court.

I. Facts and Procedural History

Our opinions in McLemore v. Hyundai Motor Manufacturing Alabama, LLC, 7 So.3d 318 (Ala.2008), and Wheeler v. George, 39 So.3d 1061 (Ala.2009), provide detailed renditions of the facts that culminated in the filing of the instant actions by McLemore/Russell against the IDB and Hyundai Motor Manufacturing Alabama, LLC (“Hyundai”). We quote here portions of those opinions and summarize other pertinent facts necessary to an understanding of the arguments presented in this appeal.
In September 2001, various State and local officials, including officials from the City of Montgomery (“the City”), the IDB, the Montgomery County Commission (“the County”), and the Montgomery Area Chamber of Commerce, began making preparations to secure options to purchase property in the Montgomery area to create an incentive package in the hope that they could persuade Hyundai to build an industrial plant in the Montgomery area for the purpose of manufacturing and assembling motor vehicles. As we explained in Wheeler:
“A significant parcel of land was an essential component of any incentive package. B.M. Ahn, the Hyundai representative in charge of the site selection for the United States plant, testified during his deposition that a critical element of an incentive package offered to an automobile manufacturer was ‘free land’ on which to locate its plant. Ahn also stated that Hyundai had no role in acquiring the land and that land acquisition for an incentive package was the responsibility of the city or the state putting the package together. Officials of the City, the County Commission, and the IDB signed a letter of intent stating that they, ‘in partnership with the State,’ would commit to provide an industrial site at no cost to Hyundai.”
39 So.3d at 1069.
As noted in McLemore, however, “[a]l-though the funds to purchase the property were to be provided by the City and the County only, the option agreements on the property were acquired by the IDB.” 7 So.3d at 322. As we further explained, the IDB’s participation was necessary in order that the transaction “ ‘comply with laws for tax breaks and incentives to the industry.’ ” 7 So.3d at 322 n. 1 (quoting the IDB’s brief).
The Russells owned approximately 328 acres of land in Montgomery County. In the fall of 2001, Reuben Thornton, who was then chairman of the IDB, signed an option agreement on behalf of the IDB for the purchase of the Russells’ property. In February 2002, Thornton, on behalf of the IDB, signed an option agreement with the McLemore group for the purchase of approximately 54 acres of land near the Russell property. Thornton also secured on the IDB’s behalf options to purchase approximately .320 acres from Southdale, LLC, and approximately 807 acres from Helen Kathryn Wheeler and William Newton Phillips, as trustee under the Doris R.H. Phillips Revocable Living Trust Agreement dated February 21, 2001 (“Wheeler/Phillips”).
Each of the option agreements was identical, providing, for an option period of 120 days and providing that “in no event shall the purchase price be less than $4,500 per acre and further provided that the pur *130 chase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property.”[1] In early 2002, the option agreements on the property owned by the Russells, Southdale, and Wheeler/Phillips were amended to provide:
“1. It is hereby agreed that the purchase price for the Property is Four Thousand Five Hundred and No/100 Dollars ($4,500.00) per acre. The exact number of acres to be determined by the survey provided by Purchaser.
“2. The option period is hereby extended for a period of 120 days from the Effective Date of the Option, which Effective Date is October 3, 2001. The expiration date of the Option, as extended, is now May 31, 2002.
“3. Except as amended hereby, the Option is in all other respects ratified and confirmed.”
During the acquisition process, another landowner, Joy Shelton, was approached about an option to purchase her property;[2] however, she refused to enter into an option agreement. At that point,
“[t]he IDB decided that the Shelton property was not necessary for the incentive package. By mid-March 2002, the IDB determined that it was not going to designate any additional funds, other than the funds already committed, to this particular project. The State and the IDB sent the incentive package, including the proposed project site, to Hyundai for consideration.
“On March 28, 2002, [however,] Ahn contacted Todd Strange, then the director of the Alabama Development Office. He stated that Hyundai had not decided whether to locate the plant in Montgomery. or in Kentucky but that additional property would need to be acquired for the rail access Hyundai required if Montgomery was to be selected as the site for the Hyundai plant. Ahn informed Strange that he would need an answer by noon of the next day as to whether the property could be acquired. Strange met with various State, City, and County officials to discuss Hyundai’s request. Recognizing that the City and the County would not provide additional funds to acquire more property and that the other option agreements contained most-favored-nation clauses, they decided to ask CSX Transportation, Inc., the rail company, to acquire the option to purchase the Shelton property.”
McLemore, 7 So.3d at 323.
• As explained in McLemore, in response to an inquiry by an official at the Alabama Development Office, a representative of CSX Transportation, Inc., responded with the following e-mail:
“ ‘Regarding the [Shelton property] that will need to be purchased, you asked if CSX would be willing to buy this property for the State and Montgomery at approximately $8,000.00 an acre. There is no contract or option on the property currently and you estimate it will cost us approximately $750,000.00 which you are willing to refund to us in some fashion •during the track construction phase. Randy Evans, [another CSX official,] in principle agreed to this and I ask that you fax us a letter outlining exactly what you have in mind. The purpose of doing it this way rather than what you did in getting control of the other 1600 acres is *131 to avoid paying the other landowners $8,000.00 an acre which would have a negative impact of $10,000,000.00 on the site cost. The railroad does not get good land values in a situation like this and so I think there will be upward pressure on that $8,000 number. Moreover, the other landowners will get wind of this ploy and may create negative community publicity.... In your letter to us we would ask that you indicate exactly how you intend to pay us during the track work construction.”
7 So.3d at 324 (footnote omitted).
Subsequently, Bobby Bright, then may- or of the City and in that capacity an ex officio member of the IDB, was selected as the main representative to meet with Shelton to acquire an assignable option agreement that would name the City, rather than either the IDB or CSX, as the purchaser of the Shelton property. Bright obtained an assignable option naming the City as the purchaser of the property; the purchase price of the property was $12,000 per acre.
On April 15, 2002, in conformance with option agreements with the Russells, the McLemore group, Southdale, and Wheeler/Phillips, the IDB gave those property owners notice that it was exercising the options on their properties at a price of $4,500 per acre. The IDB then assigned the options to the City and the County. On May 14, 2002, the City and the County purchased the properties for $4,500 per acre.
As for the Shelton property, we further explained in McLemore as follows:
“The City never exercised its option on the Shelton property. On May 22, 2002, Henry Mabry, then director of finance for the State, sent Ahn a letter confirming that the State would be funding the purchase of the Shelton property, stating:
“ ‘This is to confirm that the State of Alabama will provide the funding for the purchase of the 93 acres set aside for Hyundai’s rail yard on the date of closing. This will obviate any need for Hyundai to borrow to pay for this acquisition. In addition, the State will pay the reasonable due diligence costs incurred in connection with Hyundai’s acquisition of this property. This letter of assurance is being provided to you pursuant to Section 3.20 of the Project Agreement.’
“On May 31, 2002, the day the option agreement on the Shelton property was to expire, CSX entered into a real-estate sales contract for the purchase of the property at $12,000 per acre. When Hyundai learned that CSX, and not the State, was to pay for the rail installation and that Hyundai would be expected to enter into a long-term contract with CSX, Hyundai decided to install the rail using its own funds. As a result of Hyundai’s decision not to involve CSX in rail installation, CSX assigned the real-estate contract to Hyundai. According to the assignment contract, CSX assigned the contract to Hyundai on May 28, 2002, three days before the real-estate contract between CSX and Shelton was executed. On July 12, 2002, funds from the State of Alabama Incentives Finance Authority were transferred to Hyundai to pay for the Shelton property, and Hyundai purchased the property.”
7 So.3d at 326.
Subsequently, the Russells and the McLemore group each filed a breach-of-contract action in the Montgomery Circuit Court against the IDB and Hyundai, alleging that the IDB and Hyundai had breached the most-favored-nation clause in the option agreements by not paying them *132 $12,000 per acre for their property. The IDB and Hyundai filed a motion for a summary judgment in each of these actions, which the trial court granted. The Russells and the McLemore group appealed; this Court consolidated those appeals for the purpose of writing one opinion.
This Court affirmed the trial court’s judgment in part and reversed it in part. Specifically, the Court reversed the summary judgment for the IDB as to the Russells’ breach-of-contract claim because “a question for the jury exists as to whether the amended option agreement modified or waived the most-favored-nation clause in the Russells’ original option agreement.” McLemore, 7 So.3d at 334. The McLemore Court also held that “the Russells’ and the McLemore group’s breach-of-contract claims are not barred by the doctrine of merger.” 7 So.3d at 336. Finally, the McLemore Court concluded that
“the provisions ‘[i]f Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows’ and ‘the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property’ are ambiguous because reasonable persons could differ on whether ‘the price per acre paid to any other landowner included in the project’ refers to a purchase price paid only by the IDB or to a purchase price paid by any purchaser for property included in the project.... Because reasonable persons can differ on the meaning of the clause, i.e., whether the language ‘price per acre paid to any other landowner included in the project’ obligated the IDB to pay the Rus-sells and the McLemore group $12,000 per acre and whether the Shelton property was included as part of the project site, the evidence presents questions for the jury to resolve.... ”
7 So.3d at 338-39.
Southdale and Wheeler/Phillips also filed an action in the Montgomery Circuit Court; they alleged fraud, suppression, breach of contract, rescission, and conspiracy against multiple defendants including the IDB, Thornton, the City, the County, and others, charging that the defendants had conspired to purchase the Shelton property at a higher price than was paid for their property and conspired to do so without complying with the most-favored-nation clause contained in the option agreements. On November 2, 2007, the trial court entered a summary judgment in favor of the defendants on Southdale’s and Wheeler/Phillips’s tort claims on the basis that those tort claims were barred by the applicable statute of limitations. On November 20, 2007, the trial court entered a summary judgment in favor of the defendants on all remaining claims. Southdale and Wheeler/Phillips appealed from the summary judgments.
That appeal was addressed in Wheeler v. George, 39 So.3d 1061 (Ala.2009). Based on statements made by this Court in Wheeler, the IDB filed a motion for a summary judgment in the McLemore/Rus-sell actions, asking the trial court to dismiss the breach-of-contract claims against the IDB. On May 3, 2010, the trial court denied the IDB’s motion. The IDB filed a motion asking the trial court to certify its interlocutory order for a permissive appeal. On May 18, 2010, the trial court certified two controlling questions of law for permissive appeal to this Court. The trial court stated those questions as follows:
“1. Does the Alabama Volunteer Service Act, - [Ala.Code 1975, § 6-5-336,] bar the Plaintiffs’ claims for breach of contract?
*133 “2. Were the obligations under the option contracts signed by the Plaintiffs and the IDB assumed .by the City of Montgomery and Montgomery County, thus barring any claims for breach of contract against the IDB?”
On May 28, 2010, the IDB filed with this Court a petition for permission to appeal the trial court’s denial of its motion for a summary judgment based on the trial court’s certification of the above-quoted questions. This Court granted the petition on August 17, 2010.

II. Standard of Review

“ ‘ “We apply the same standard of review [in reviewing the grant or denial of a summary-judgment motion] as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.” ’
“Mutual Assurance, Inc. v. Schulte, 970 So.2d 292, 295 (Ala.2007) (quoting Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004)).”
Panayiotou v. Johnson, 995 So.2d 871, 875-76 (Ala.2008). “Questions of law are reviewed de novo. Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330 (Ala.2006).” McLemore, 7 So.3d at 327 (quoting Catrett v. Baldwin Cnty. Elec. Membership Corp., 996 So.2d 196, 200 (Ala.2008)).

III. Analysis

As the questions certified by the trial court indicate, the IDB argues that the McLemore/Russell breach-of-contract claims against it should be dismissed on two alternative grounds. First, it contends that the Wheeler Court held that the IDB assigned the option agreements to the City and that, therefore, the IDB cannot be held liable for any alleged breach of those option agreements. Second, it contends that the Wheeler Court concluded that the IDB is immune from all claims in tort and contract because of the application of the Volunteer Service Act, § 6-5-336, Ala.Code 1975 (“the VSA”), to the IDB’s chairman, Thornton. The IDB asks this Court, as' it did the trial court, to apply these “holdings” in Wheeler to the breach-of-contract claims brought against it by McLemore/Russell.
Before we address these arguments, however, we begin by noting that McLe-more/Russell argue that the IDB should not be permitted to contend that it is entitled to a summary judgment on their breach-of-contract claims because this Court in McLemore concluded that McLe-more/Russell were entitled to a jury trial on that claim. McLemore/Russell contend that McLemore is the law of the case in this regard. McLemore/Russell observe that this Court has stated that,
“[u]nder the doctrine of the ‘law of the case,’ whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the facts on which the *134 decision was predicated continue to be the facts of the case.”
Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala.1987). In essence, McLe-more/Russell take issue with the fact that the IDB filed a second motion for a summary judgment on the same claims this Court addressed in McLemore, raising defenses the IDB pleaded in its answer to the complaint but did not raise in its initial motion for a summary judgment. McLe-more/Russell note that the facts upon which McLemore was decided have not changed, and thus they argue that this Court’s determination that genuine issues of material fact exist concerning their breach-of-contract claims cannot be challenged by the IDB in a second motion for a summary judgment.
The issues raised by the IDB in its second motion for a summary judgment are not the same as the issues raised in the first motion for a summary judgment and on appeal to this Court from the trial court’s ruling on the first motion. Accordingly, there has been no holding by either the trial court or this Court as to the issues raised in the second summary-judgment motion; thus, no “law of the case” has been “established” as to those issues. See Bagley ex rel. Bagley v. Creekside Motors, Inc., 913 So.2d 441, 446 (Ala.2005) (“[T]he doctrine of law of the case ... is inapplicable to this case because we did not, in the original appeal, dispositively decide the issue [now raised].”); Poole v. Prince, 61 So.3d 258, 274 (Ala.2010) (“Because this Court did not definitively address in [the prior appeal] the issue whether a binding contract existed between the parties, the law-of-the-case doctrine does not preclude the trial court’s determination of that issue on remand.”); Lyons v. Walker Reg’l Med. Ctr., Inc., 868 So.2d 1071, 1077 (Ala.2003) (“[0]n remand the issues decided by an appellate court become the ‘law of the case.’ ” (emphasis added)).
We now examine the arguments presented by the IDB. The IDB bases its argument that its assignment of the option agreements to the City relieved it of any liability under those agreements on the following portion of the Wheeler opinion:
“The City first argues that the City was not a party to the option agreements executed by the IDB and therefore was not liable for breach of contract because, it argues, the IDB was not acting as the City’s agent. Under such circumstances, the City says, it is not liable under any breach-of-contract theory. We disagree. Pursuant to Resolution No. 111-2002, adopted by the City in June 2002 in conjunction with the Hyundai project, ‘the IDB did exercise the purchase options, but assigned its rights to purchase thereunder to the City and Montgomery County (the “County”), and the City and County each have issued debt to provide the necessary funds and have acquired the Parcels.’ As the IDB’s assignee, the City assumed the obligations and liabilities of the assigned contracts. Meighan v. Watts Constr. Co., 475 So.2d 829, 834-35 (Ala.1985).”
Wheeler, 39 So.3d at 1083-84 (emphasis added).
In its principal brief, the IDB argues:
“Because the City of Montgomery assumed all of the obligations under the option contracts, there can be no liability for breach of contract on the part of the IDB. To establish a breach of contract, [McLemore/Russell] must show
“ ‘(1) the existence of a valid contract binding the parties to the action, (2) [their] own performance under the contract, (3) the defendant’s nonperformance, and (4) damages.’
*135 “Congress Life Ins. Co. v. Barstow, 799 So.2d 931, 937 (Ala.2001) .... [McLe-more/Russell] cannot prove the first required element — the existence of a valid contract binding the parties to this action. This is because the City of Montgomery assumed all of the obligations under the options. The IDB no longer has any duties, obligations, rights or remedies under the option contracts.”
The IDB essentially argues that, because this Court stated in Wheeler that the City, as the assignee of the option agreements, is potentially liable for breach of contract, the Court impliedly held that the IDB is not liable. We reject this argument for several reasons.
First, the portion of the Wheeler opinion relied upon by the IDB addressed the City’s potential liability for breach of contract; it did not address, much less determine, the IDB’s potential liability for breach of contract.
Second, the IDB cites no authority for its proposition that the assignment of rights under a contract relieves the assign- or of any potential for liability for duties not performed under the assigned contract. Moreover, the law provides no support for such a proposition and, indeed, supports the contrary proposition. In a dissent in DuPont v. Yellow Cab Co. of Birmingham, Inc., 565 So.2d 190, 193 (Ala.1990), Justice Jones explained the distinction between assignment and delegation:
“In the instant case, there exist both an assignment of rights and a delegation of duties. The assignment-delegation distinction is relatively straightforward: rights are assigned; duties are delegated. When a party to a contract transfers his rights under the. contract to a third party, he has made an assignment. If a party to the contract appoints a third party to render performance under the contract, he has made a delegation. Generally speaking, upon assignment of a right, the assignor’s interest in that right is extinguished; however, upon the delegation of a contractual duty, the delegating party remains liable under the contract, unless the contract provides otherwise or there is a novation. Calamari and Perillo’s Hornbook on Contracts, § 18-25 (3d ed.1987). Professor Knapp analogizes the assignment-delegation distinction thusly: ‘If assigning a right is like passing a football, then' delegating a duty resembles more the dissemination of a catchy tune or a communicable disease: Passing it on is not the same as getting rid of it.’ C. Knapp, Problems in Contract Law 1161 (1976).”
(Footnote omitted.) See also Restatement (Second) of Contracts § 318 (1981).
According to the portion of Wheeler relied upon by the IDB, the IDB assigned to the City and the County its rights under the option agreements. Assuming that this assignment of rights carried with it a delegation of the duties owed by the IDB under the agreements, the IDB nonetheless also would have had to demonstrate either (1) that the terms of the contracts allowed the IDB to relieve itself of contractual liability by way of such a delegation or (2) that the parties had entered into novations pursuant to which McLe-more/Russell agreed that the IDB’s obligations had changed. See generally, e.g., Marvin’s, Inc. v. Robertson, 608 So.2d 391, 393 (Ala.1992) (explaining that “ ‘[a] novation is the substitution of one contract for another, which extinguishes the pre-exist-ing obligation and releases those bound thereunder.... In addition; the party alleging a novation has the burden of proving that such was the intention of the parties.’ ” (quoting Pilalas v. Baldwin County Sav. & Loan Ass’n, 549 So.2d 92, 94-95 (Ala.1989) (emphasis omitted))). The IDB does not assert or demonstrate *136 either condition. Accordingly, the trial court’s denial of the IDB’s motion for a summary judgment is not due to be reversed on this ground.
We turn now to the IDB’s argument that it is immune under the VSA from the McLemore/Russell breach-of-contract claims. We first note that the VSA does not grant immunity to governmental or other entities, but grants immunity only to natural persons serving as “volunteers” for certain entities. The VSA, § 6-5-336(c)(4), Ala.Code 1975, defines a “volunteer” as “[a] person performing services for a nonprofit organization, a nonprofit corporation, a hospital, or a governmental entity without compensation, other than reimbursement for' actual expenses incurred.” Section 6-5-336 then provides:
“(d) Any volunteer shall be immune from civil liability in any action on the basis of any act or omission of a volunteer resulting in damage or injury if:
“(1) The volunteer was acting in good faith and within the scope of such volunteer’s official functions and duties for a nonprofit organization, a nonprofit corporation, hospital, or a governmental entity; and
“(2) The damage or injury was not caused by willful or wanton misconduct by such volunteer.”
(Emphasis added.) Further, when the legislature passed the VSA, it declared in § 6-5-336(b):
“(1) The willingness of volunteers to offer their services has been increasingly deterred by a perception that they put personal assets at risk in the event of tort actions seeking damages arising from their activities as volunteers;
“(2) The contributions of programs, activities, and services to communities is diminished and worthwhile programs, activities, and services are deterred by the unwillingness of volunteers-to serve either as volunteers or as officers, directors, or trustees of nonprofit public and private organizations;
“(3) The provisions of this section are intended to encourage volunteers to contribute their services for the good of their communities and at the same time provide a reasonable basis for redress of claims which may arise relating to those services.”
(Emphasis added.)
The IDB attempts to find support for its position in the following portion of this Court’s opinion in Wheeler:
“It is undisputed that Thornton served as an unpaid volunteer member of the IDB. He was employed full-time in his own insurance business, arid he served as the chairman of the IDB on a voluntary part-time basis. The IDB is a ‘governmental entity as defined in the Volunteer Service Act, § 6-5-336(c)(l). See also Harris v. Ethics Comm’n, 585 So.2d 93, 95 (Ala.Civ.App.1991), in which the Court of Civil Appeals quoted with approval a statement from a trial court’s order stating that industrial development boards ‘clearly reflect attributes and characteristics of a governmental entity.’ Accordingly, Thornton is a volunteer under, the Volunteer Service Act and is entitled to immunity so long as his actions or inactions were not wanton or willful.
[[Image here]]
“Because we have determined that Thornton is entitled to immunity under the Volunteer Service Act, the IDB is also entitled to immunity. In Hollis v. City of Brighton, 885 So.2d 135, 141-42 (Ala.2004), the plaintiffs sued the City of Brighton, alleging that the city had failed to extinguish a fire at their house and had prevented the plaintiffs from trying to extinguish it. This Court held:
*137 “ ‘The vicarious liability of a putative master under the rule of respon-deat superior depends upon the liability of the putative servant. See Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614 (Ala.1981) (‘“[W]hen [a] principal and his agent are sued in [a] joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.’ ”) (quoting Louisville & N.R.R. v. Maddox, 236 Ala. 594, 600, 183 So. 849, 853 (1938)), and Gore v. City of Hoover, 559 So.2d 163,165 (Ala.1990), overruled on other grounds, Franklin v. City of Huntsville, 670 So.2d 848 (Ala.1995) (holding that a city could not be held vicariously liable for the act of a magistrate who was immune from liability). Thus, if a putative servant is not liable, either because he is innocent or because he is immune, no liability exists to be visited upon the putative master under the rule of respondeat superior. Id.
[[Image here]]
“ ‘As discussed above, the firefighters, the putative servants in the case now before us, were volunteers who did not receive compensation for their service as volunteer firefighters. Consequently, they were immune from liability for negligence under the Volunteer Service Act. Because the firefighters were immune from liability for negligence under the Volunteer Service Act, no liability for negligence could befall them to be visited upon the City [of Brighton], the putative master in the case now before us.’
“The IDB cannot be held vicariously liable for the acts of its chairman because Thornton was immune from liability under the Volunteer Service Act. The summary judgment entered in favor of the IDB is due to be affirmed on this alternative ground.”
Wheeler, 39 So.3d at 1089-91 (emphasis added). The IDB argues that the foregoing supports the conclusion that the IDB is immune from liability under the VSA as to McLemore/Russell’s claims of breach of contract.
The principle that an entity may be insulated from vicarious liability that would otherwise result from the misfeasance or malfeasance of its employee or agent where the employee or agent enjoys immunity for his or her acts or omissions is not apposite here. This is a breach-of-contract action against the IDB, a party to the contract at issue, alleging its breach of that contract. The following argument in the brief of the appellees, the Russells and the McLemore group, is meritorious:
“The breach occurred when the IDB failed to pay the full purchase price for the property. [McLemore/Russell] did not sue Reuben Thornton individually because he had no personal liability for the breach by merely signing the option on behalf of the IDB. They also did not sue Mr. Gallion because the election to purchase the property was signed by him in a representative capacity on behalf of the IDB. An individual signing a contract on behalf of a corporate entity has no liability for breach of that contract. If an agent, in [signing] a contract, discloses his principal and makes it appear on the face of the paper that it is the contract of the principal and he signs it as agent, of course the principal is bound, the undertaking being within the agency, and the agent is not. Lutz v. Van Heynigen Brokerage Company, 199 Ala. 620, 625, 75 So. 284, 286 (1917); *138 Professional Business Systems, Inc. v. Kaufman, 507 So.2d 421 (Ala.1987).
“The IDB, in its most recent Motions for Summary Judgment, is confusing agency law, as it pertains to an agent’s authority to sign a contract for his principal, with a master-servant relationship that allows for culpability on the part of the master for the torts of its servants on the theory of respondeat superior. [McLemore/Russell] have not alleged liability against the IDB based upon re-spondeat superior for the acts of its agents. The liability of the IDB in this ease is for breach of a purchase contract by the IDB after it elected to exercise the option through its authorized agent, Mr. Gallion, but failed [ — ie., the IDB failed — ] to pay the full purchase price.”
(Emphasis in original.)
The doctrine of vicarious liability is premised on the fact that an agent or employee has committed his or her own misfeasance or malfeasance — ie., the agent or employee has violated a duty created and imposed by law upon him or her, as an individual — in circumstances under which the law also deems it appropriate to hold accountable the principal. A duty created by contract is one imposed upon the party to the contract, not directly upon the employee or agent of that party. If an employee or agent acting within the scope of his or her employment or agency acts in a manner that causes the principal to be in breach of the principal’s contract, the breach is that of the principal itself, not of the employee, who is not a party to the contract. The concept of vicarious liability is jurisprudentially inapposite (and unnecessary) in such a circumstance.
Finally, it may also be noted that § 11-54-87, Ala.Code 1975, provides, in part, as follows:
“(a) The industrial development board shall have the following powers together with all powers incidental thereto or necessary for the performance of those stated in this subsection:
[[Image here]]
“(2) To sue and be sued and to prosecute and defend civil actions in any court having jurisdiction of the subject matter and of the parties
[[Image here]]
(Emphasis added.) To hold that the VSA and the above-quoted portion of this Court’s opinion in Wheeler render an entity immune from all claims — including claims arising in contract — essentially would eliminate any field of operation for the above-emphasized language in § 11-54-87, except where an agent or employee has acted willfully or wantonly. “Statutes should be construed together so as to harmonize the provisions as far as practical.” Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala.1991). Clearly, pursuant to § 11-54-87, industrial development boards are given the power to purchase property and to enter into contracts for that purpose. Although the VSA clothes volunteers— such as members of the IDB’s board of directors — from liability in tort so long as the volunteers’ actions are not willful and wanton, and thereby also renders the IDB itself immune from vicarious liability, § 6-5-336 does not operate to prevent an industrial development board from being sued and facing liability for breaches by it of its contracts. The trial court did not err in denying the IDB’s motion for a summary judgment on this ground.

IV. Conclusion

The trial court’s order denying the IDB’s motion for a summary judgment, in which the trial court rejected the IDB’s arguments that the IDB should be relieved from liability based on its assignment of it rights under the option agreements and *139 that it is immune -from suit under the VSA, is due to be affirmed.
APPLICATION . OVERRULED'; OPINION OF AUGUST 12, 2011, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
STUART, BOLIN, SHAW, AVISE, and BRYAN, JJ., concur.
MOORE, C.J., concurs in the result.
MAIN, J., recuses himself.

. Such a provision is known as a "most-favored-nation” clause or a "price-escalation” clause.

. It appears that members of the Montgomery Area Chamber of Commerce approached Shelton at this time about selling her property for inclusion in the project.