JOSEPH E. COREIL, Judge Pro Tem.
The dispute in this case focuses on an agreement entitled “Assignment of Oil, Gas and Mineral Leases” entered into between Carnes W. Weaver and his wife, Lorraine Weaver, (hereinafter collectively referred to as Weaver), assignors and Florida Exploration Company, assignee [1]. This appeal is taken by Carnes W. Weaver, Lorraine Weaver, and Elizabeth L. Barnett[2], plaintiffs and appellants herein, from a judgment in their favor which they wish to have modified. Defendant-appellee, Florida Exploration Company (Florida), answered the appeal, setting forth several assignments of error. We find no error in the judgment of the trial court and thus, we affirm.
*1036 FACTS
On November 1, 1981, Weaver entered into an agreement with Florida. The agreement covered fifty-eight oil, gas, and mineral leases and established certain requirements that Florida would have to fulfill to earn an interest in the leases. Florida paid Weaver $1,000,000 in exchange for the right to earn leasehold rights in the leases.
In May of 1985, plaintiffs filed this proceeding, alleging that Florida had failed to fulfill its obligations under the agreement and that Weaver was entitled to a reassignment of the subject leases. After trial, the court directed Florida to reassign the subject leases to Weaver effective July 31, 1989, the date of judgment. Insofar as reassignment proved an impossibility, a new trial was held in March of 1990, to allow Weaver the right to present further proof as to damages. The trial court awarded Weaver $36,564.72, representing the sum necessary for the reacquisition of the subject leases.
By this appeal, Weaver contends that the trial court erred in denying his claim for lost net revenue caused by Florida’s failure to reassign the acreage and by denying Weaver’s claim for damages caused by the alleged negligence of Florida in destroying the wellbore in the Homer Haber No. 1 well. Additionally, Weaver contends that the trial court incorrectly calculated and assessed damages for the cost of reacquisition of leases by Weaver.
By answer to the appeal, Florida essentially contends that the trial court erred in defining “commercial producers” in the agreement and in finding that the Caffery No. 1, Rayne Heirs No. 5, and Rayne Heirs No. 6 wells were not commercial producers. For the same reason, Florida contends that the trial court erred in finding that Florida did not earn any acreage under the partial earning provision of the agreement.
Florida also contends that Weaver’s claim for negligent loss of the Homer Haber No. 1 Wellbore was not properly raised either by the pleadings or by amendment and thus, the trial court erred in permitting Weaver to introduce evidence on this issue.
Finally, Florida contends that the judgment appealed from should be reversed insofar as it held Florida liable for damages for failure to reassign all acreage covered by the agreement. Alternatively, Florida contends that because the obligation to reassign acreage was held to be due and ascertainable on the date of judgment, the trial court erred in awarding interest on Weaver’s damage award from the date of judicial demand.
“COMMERCIAL PRODUCERS”
We must first determine whether the trial court erred in its determination that the terms “commercial producer” did not mean the same as the terms “wells producing or capable of producing in paying quantities.”
The trial court, in finding that Florida had earned no lease interest under the agreement and as such, was obligated to reassign all of the acreage contained within the agreement, stated in its written reasons for ruling, in pertinent part, as follows:
“On November 1, 1981, Plaintiff Weaver assigned the Defendant Florida Exploration Company certain lease interests (Plaintiff Exhibit No. 1) covering three different areas or strata, to-wit: (2) The Clement Sand Wells, (2) A Marg Tex Well, and (3) Shallow wells of 6,000 feet or less. Of these, the only one essentially at issue is the Clement Sand Wells.
“Pursuant to such Assignment, Florida drilled or reentered seven (7) wells.
“Under the Assignment, Florida had to meet both (1) a drilling requirement (Paragraph 2 of the Assignment) and (2) a requirement of completing four (4) ‘... earning wells as commercial producers of oil or gas ... ’ in order to acquire the interest as provided for in the Assignment. (Paragraph 4 of the Assignment.)
“A well to be an earning well requires that it meet a two tier test — i.e.:
1. Drilling requirement must be met.
2. The well must be a commercial producer.
*1037 “When the specific language of Section I, Paragraph 2 of the Assignment is considered, the first alternative method by which Florida could fulfill the requirement was to drill . to a depth sufficient TO TEST the stratigraphic equivalent of the Clement SAND ... ’ (emphasis added) which appears to the Court to necessarily envision and require that the well would have to be drilled to a sand that was the stratigraphic equivalent of the Clement Sand, and that the drilling be sufficient so that the sand could be tested. Merely drilling to a particular depth without a testable sand which was the equivalent of the Clement Sand would not fulfill this requirement.
“As to the second alternative method of fulfilling the drilling requirement of this paragraph, it would be sufficient to drill to a depth whose pressure would require the setting of protective casing whether or not a testable sand was actually present.
“It therefore appears that to fulfill the requirements of Paragraph 2, Florida would have had to either drill to a testable sand as defined or to a depth where high pressure required the setting of protective casing. This standard will now be applied to the wells the Defendant submits as fulfilling this Paragraph 2 requirement, to wit: the Caffery No. 1, the Rayne Heirs No. 5, and the Rayne Heirs No. 6.
“Therefore, in summary, Florida meets the first tier of the two-tier test in that the drilling requirements of Paragraph 2 have been met. Having met the first tier test, we must now consider whether the second tier test of four (4) ‘... earning wells as commercial producers ... ’ was met.

Earning Wells as Commercial Producers of Oil or Gas (Sec. I Par. 4)

“In addition to meeting the drilling requirements of Section I, Paragraph 2, Defendant must complete four (4) ‘... earning wells as COMMERCIAL PRODUCERS of oil or gas ... ’ into order to acquire the ownership interest as therein specified. Therefore, this ‘... commercial producer ...’ standard must be applied to the three wells Defendant submits as actually ‘... earning wells ...’ under the agreement — i.e., the Caffery No. 1, the Rayne Heirs No. 5, and the Rayne Heirs No. 6.
“However, before this standard can be rationally applied, there must be a determination made as to the meaning of ‘... commercial producer ...’. Such term is not defined in the agreement with specificity. It would, however, be of benefit to examine other related terms in the Assignment.
“With respect to Section II of the Assignment (which deals with shallow depth wells [6000 lease area] which were never drilled and are not at issue herein), does offer assistance as to meaning of terms. In Section II, Paragraph 2, it is noted that the standard to determine whether the wells are sufficient to earn an interest through such shallow area is:
... completed as wells producing or capable of producing oil or gas IN PAYING QUANTITIES ... (emphasis added) This specific and clear difference in standards (‘commercial producers’ in Section I Clement Sand Wells versus ‘in paying quantities’ in Section II shallow depth wells) can have only one rational meaning, and that is that the standard of ‘commercial producer’ is meant to be different from the standard ‘in paying quantities.’
“If then ‘commercial producer’ does not mean the same thing as ‘in paying quantities’, what does it mean? For the contemplation and intent of parties to be ascertained, one must look to the basic Assignment. Section I, Paragraphs 6 and 7 are particularly revealing.
6. It is understood and agreed that during the Payout period, as hereinafter defined, FLORIDA shall own Seventy (70%) Percent of the net revenues from all of the Subject Leases with WEAVER reserving overriding royalty interests covering and affecting such leases equal to the difference between *1038 the present burdens affecting said leases and Thirty (30%) Percent of the production attributable thereto. Payout is defined as being such time as FLORIDA recoups from its share of production from such wells One Hundred (100%) Percent of the costs of drilling all dry holes thereon and also the costs and expenses of drilling, completing, equipping and operating all of the earning wells drilled on the Subject Leases.
7. After payout, WEAVER shall have the option to convert the overriding royalty interest reserved by it to a Fifty (50%) Percent working interest in each of the earning wells located on the Subject Leases.
It thus appears quite clearly that what was in the contemplation of the Assignment were wells which would activate these paragraphs, and, thus, be wells of such producing magnitude and duration as to not only achieve payout as therein defined, but go on continued production under the triggering provision of Paragraphs 6 and 7.
“When the wells advanced by Defendant as earning wells are considered under this standard, it is quickly apparent that they do not meet the test. Indeed an examination of the analysis of One Hundred (100%) Percent Field Payout document shows that these wells did not even achieve payout.
“Accordingly, since the Defendants had not performed in accordance with the provision of Section I, Paragraphs 3 and 4, it became obligated under Section II, Paragraph 7 (made specifically applicable to the Clement Sand Well) to reassign to Weaver all acreage that Florida had not earned.[3]
“There thus remains the issue of whether Florida has earned a partial acreage under Section I, Paragraph 5.
5. Until FLORIDA completes as commercial producers four (4) wells drilled pursuant to the terms hereof, FLORIDA shall earn with respect to each producing well only to the depth drilled by such well plus 100 feet and the Allocated Acreage around such well; Allocated Acreage being defined as forty (40) acres in case of an oil well, one hundred sixty (160) acres in case of a gas well, such well (in as near the form of a square as is practicable), or such acreage around such well within a unit created by the Commissioner of Conservation.
Since the paragraph commences by reference to the four (4) ‘commercial producers’, the issue arises whether the following language ‘...' with respect to each producing well ... ’ was intended to mean a ‘commercial producer’ well, or whether it was contemplated to refer to any producing well, whether or not it was a ‘commercial producer’. Considering the basic Assignment within the contemplation of the parties, it must be that the standard throughout this Clement Sand section, Section One (I) of the Assignment was intended to be the same. Accordingly, we must consider ‘... each producing well ... ’ as necessarily intended to mean each commercial producer well. Since none of the wells so tendered meet such standard, Florida has earned no such partial rights under Section I, Paragraph 5, and therefore is obligated to reassign all.”
We also note that, even under Florida’s interpretation of the agreement, wherein allegedly the terms “commercial producers” are used allegedly interchangeably and mean the same as “wells producing or capable of producing oil or gas in paying quantities,” Florida would not have earned any acreage under the agreement.
La.R.S. 31:124 of the Louisiana Mineral Code states, in pertinent part, as follows:
*1039 “When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.”
We find it highly unlikely that any of the three wells, discussed above, which met the first tier drilling requirements of the agreement, also met the second tier “commercial producer” requirement of the agreement, even under a “paying quantities” interpretation of “commercial producer.” Caffery No. 1 produced a profit for three months after completion, beginning in August of 1983; Rayne Heirs No. 5 produced a profit for five months, ending in August of 1984; and Rayne Heirs No. 6 produced a profit for six months, ending in December of 1984. No further wells were drilled, thereby Florida’s duty to reassign went into effect in the latter part of 1984; this action was brought by Weaver in May of 1985.
To count as an “earning well,” a well would need current commercial production or, at a minimum, need to evidence a potential for profitable production to be considered a producer in paying quantities. None of the wells drilled were commercially productive or producing in paying quantities at the time Weaver brought this action. Thus, Florida has neither retained any allocated acreage surrounding any well via production nor earned any interest in all of the subject leases via the drilling of four commercially productive wells, under any interpretation of the agreement.
Insofar as Florida has not earned and held any acreage under the agreement, it is obligated to reassign the leases, the subject of the agreement, or be liable in damages for its failure to reassign.
HOMER HABER NO. 1 WELLBORE
Weaver also seeks damages for the loss of the wellbore on Homer Haber No. 1. In turn, Florida contends that Weaver’s claim for damages due to the loss of the wellbore was neither raised by the pleadings nor amended at trial and thus the trial court erred in permitting Weaver to introduce evidence concerning this issue. The trial court found that the testimony was contradictory and that Weaver had failed to prove by a preponderance of the evidence that the wellbore was lost through Florida’s fault. Insofar as we agree with this finding of the trial court, we need not reach the issue presented by Florida as to the correctness of allowing evidence on this issue.
REACQUISITION
Subsequent to the initial hearing in this matter, a new trial was granted as to the issue of damages for failure to reassign the leases, extending to and including the issue of reacquisition, the inability to reacquire, together with matters incidental thereto. The trial court, in written reasons for ruling, discussed the issue and awarded damages as follows:
“The leases subject to such reacquisition have been secured by a lease brokerage firm as detailed by Petitioner in a lease schedule. This leaves acreage remaining not yet reacquired that is either held by lease to other parties or that the mineral owners have refused to lease for the amounts authorized. Petitioner contends that it will necessarily have to successfully complete negotiations to create an assignment to complete the lease block, and will be compelled to pay an amount far in excess of the amounts paid by the present lessor when these leases were taken.
“COSTS OF REACQUIRING LEASES
The Court finds that Petitioner has proven in damages and is entitled to the lease acquisition costs of the 559.45 acres acquired thus far and of the 28.55 net acres that Petitioner is entitled to but has not yet leased. The cost of hiring a lease broker, (Mr. Paul Dubroc, whose testimony was heard by the Court), is also a provable element. However, com *1040 pensation of Mr. Dubroc was with an overriding royalty interest therein and without proof and was speculative and has not been proven with reasonable certainty and, thus, the court cannot make an award therefor.
“Thus, Petitioner is not entitled to damages due to speculation as to how much this overriding royalty interest is worth. Further, the Court has not been offered an accounting of the time spent by Mr. Dubroc in reacquiring the leases, and thus cannot evaluate how much this time would be worth.
“The Court finds that $50.00 per acre, which is what was paid by Petitioner to lease the acreage acquired, is a reasonable rate of compensation for reacquiring the leased property. Thus Petitioner is entitled to $29,400.00 (588 acres X $50.00 per acre). To this should be added the following:
Recordation fees - $2,584.74
Bank charges - $ 586.00
Brokerage expenses - $3,993.98
FUTURE LEASE ACQUISITION COSTS
“The Court has previously stated that overriding royalties have not been proven. There has been no offer to buy or sell, only the Petitioner’s own estimate of what the royalty interest is worth. The value of such interest is thus speculative and uncertain.
Thus Plaintiff is entitled to and is awarded:
Cost of lease acquisition - $29,400.00
Recordation fees - 2,584.74
Bank charges - 586.00
Brokerage expenses - 3,933.98
Total - $36,564.72”
After our review of the record, we find that the trial court correctly calculated and assessed damages to be awarded Weaver arising from the cost of reacquisition of the subject leases.
LOST NET REVENUES
Weaver alleges the trial court erred in denying his claim for lost net revenue caused by the failure of Florida to reassign the acreage. This claim is based upon Weaver’s contention that Florida was obliged to reassign to Weaver all of the acreage as of August 23, 1984, and therefore, Florida owes to Weaver the net revenue from the Rayne Heirs No. 6 well which accrued between August 23, 1984 and December 31, 1984, in the amount of $228,-598.68.
In a hearing on June 26, 1989, the trial court held that the date wherein the obligation to reassign would arise would be the date of the original judgment, which was signed July 31, 1989. On June 29, 1989, Weaver’s attorney wrote a letter to defendant’s attorney making a formal demand for reassignment based upon the court-imposed effective date for the defendant’s obligation to reassign. This ruling has not been assigned as error and we find no error in this determination. As such, we find no error in the trial court’s ruling denying Weaver’s claim for lost net revenues prior to the court-imposed date of reassignment.
INTEREST
Finally, Florida contends that because the obligation to reassign acreage was held to be due and ascertainable on the date of judgment, the trial court erred as a matter of law in awarding interest on the damage award to Weaver from the date of judicial demand. We find no merit in this assignment of error. The court-imposed date of reassignment was imposed due to the difficulty and impracticality of imposing a back date to the obligation to reassign. Reassignment was found to be impossible after the judgment of July 31, 1989. An award of damages, in lieu of reassignment, is not faced with this practical problem. As such, we find no error in the trial court’s awarding Weaver interest from the date of judicial demand.
CONCLUSION
Based upon the foregoing, the judgment of the trial court is affirmed. Costs of this appeal are to be paid by defendants, Florida Exploration Company, et al.
*1041 AFFIRMED.

. The remaining defendants, Houston Natural Gas Corporation, Apache Corporation, and APC Operating Partnership, are successors to the interests received under the agreement.

. Barnett is a royalty mineral owner in certain properties.

. Section I, Paragraph 3 states:
"3. FLORIDA will continue its exploration activities by commencing the drilling of additional wells within sixty (60) days after the completion or abandonment of the preceding well to the Contract Depth referred to above until such time as FLORIDA shall have completed as commercial producers of oil or gas four (4) such wells."