# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————

United States Court of Appeals
Fifth Circuit

**FILED**
July 31, 2020

Lyle W. Cayce
Clerk

No. 19-20271

————————

TOTAL E&P USA, INC.,

Plaintiff - Appellant Cross-Appellee

v.

MARUBENI OIL & GAS (USA), INC.,

Defendant - Appellee Cross-Appellant

-------------------------------------------------------------

Consolidated with: 19-20282

TOTAL E&P USA, INC.,

Plaintiff - Appellant

v.

MARUBENI OIL & GAS (USA), INC.,

Defendant - Appellee

————————————

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-2674
USDC No. 4:16-CV-2671

————————————

Before BARKSDALE, HAYNES, and WILLETT, Circuit Judges.

No. 19-20271 c/w No. 19-20282

PER CURIAM:[*]

TOTAL E&P USA, INC. ("Total") appeals two district court judgments[1] holding it liable for the cost of abandoning certain offshore oil and gas assets. Marubeni Oil & Gas (USA), Inc. ("MOGUS") cross-appeals one district court's denial of its motion for judgment as a matter of law on damages related to the abandonment. We AFFIRM the judgment in Case No. 19-20271 and REVERSE and RENDER judgment in Case No. 19-20282.

## I. Background

### A. The Assets and Operating Agreements

These consolidated appeals involve the abandonment of assets in the "Canyon Express" oil and gas development in the Gulf of Mexico. Canyon Express contains three oil and gas fields. The fields are connected by a shared pipeline structure known as the Canyon Express Pipeline System ("CEPS"). Two Canyon Express properties are at issue here: (1) CEPS itself and (2) a connected oil and gas field known as MC 305.[2]

### 1. CEPS

In 2000, Total and several other companies entered into the CEPS Operating Agreement (the "CEPS Agreement"). The CEPS Agreement governed the parties' "respective rights, duties and obligations" in building, running, and eventually abandoning the "Common System," or CEPS. It

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] These two cases were consolidated for appeal: Case No. 19-20271 (District Court No. 4-16-cv-02674) and Case No. 19-20282 (District Court No. 4:16-cv-02671).

[2] The other connected fields are Mississippi Canyon Block 348 ("MC 348") and King's Peak. Neither property is at issue here; the MC 348 case is still pending in the district court under Case No. 4:16-cv-02678.

referred to the parties as "Common System Owner[s]."  It also listed each Common System Owner's "Equity Interest" in CEPS based on its ownership in the connected oil and gas fields.

Total was the original "Operator" of CEPS under the CEPS Agreement. As Operator, Total was required "to operate, maintain, upkeep, repair, [and] administer" CEPS.  Total also received rights-of-way from the government to install CEPS.

Two provisions of the CEPS Agreement are important here.  The first, Article 11.3, governs abandonment of CEPS.  Article 11.3 states:

> Abandonment Operations Required by Governmental Authority. The Operator shall conduct the abandonment of the Common System as required by law and any governmental authority, and the Abandonment Costs, risks and net proceeds will be shared by the Common System Owners based on the Common System Owner's Equity Interest at the time of abandonment.

The second key provision, Article 14.1, governs assignment of interests in CEPS.  It states in relevant part:

> Assignment. . . .  No Common System Owner assigning all or a part of its Equity Interest in the Common System is released from its obligations and liabilities created under this Agreement attributable to the period prior to the date of execution of the assignment (which obligations include liability for abandonment of the Common System, or that portion of the Common System in existence as of the date of execution of the assignment).

MOGUS acquired an interest in CEPS in 2003.  Three years later, Total assigned its interest in CEPS—including the CEPS operator responsibilities and rights-of-way—to ATP Oil & Gas Corporation ("ATP").  Over a year later, ATP also bought another company's interest in CEPS.  Since January 2010, the interest holders in CEPS have been MOGUS, ATP, and Black Elk Energy Offshore Operations, LLC ("Black Elk").

No. 19-20271 c/w No. 19-20282

### 2. *MC 305*

In 1998, Total and another party leased MC 305.  The parties also agreed to the MC 305 Operating Agreement (the "MC 305 Agreement").  The MC 305 Agreement referred to the signatories as "Participating Parties."  The MC 305 Agreement "governs the rights and obligations of the Parties relating . . . to the exploration, development, operation, production, treatment, gathering, and storage of Hydrocarbons" in MC 305.  Under the MC 305 Agreement, the Participating Parties "participate in the sharing of . . . the Costs, risks, and benefits . . . of an activity or operation proposed."  Each party's responsibility is based on its "Participating Interest Share."  Total was the first "Operator" of MC 305.

Two provisions of the MC 305 Agreement are at issue here.  The first provision, Article 18.4, governs abandonment of MC 305.  Article 18.4 states:

> Abandonment Operations Required by Governmental Authority.
> The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

The second provision, Article 24.1.4, governs assignment of interests in MC 305.  Article 24.1.4 states in relevant part:

> Form of Assignments: . . . No Party assigning all or part of its Working Interest ["the record title leasehold interest or, where applicable, the operating rights of each party in and to each lease"] is released from its obligations and liabilities created under this Agreement prior to the effective date of the Assignment.

In early 2006, MOGUS obtained an interest in MC 305.  Several months later, Total assigned its interest in MC 305 to ATP.  Since January 2010, the interest holders in MC 305 have been MOGUS, ATP, and Black Elk.

4

**B.    ATP's Bankruptcy and Settlement**

By January 2010, ATP, Black Elk, and MOGUS co-owned all interests in CEPS and MC 305.  But in 2012, ATP filed for bankruptcy.  ATP also informed the Bureau of Safety and Environmental Enforcement (the "Bureau") of the U.S. Department of the Interior that it could not cover the upcoming decommissioning operations at Canyon Express.  By then, Black Elk was also in financial distress; it was later involuntarily placed into bankruptcy.  The Bureau thus required MOGUS—the only solvent Canyon Express owner—to complete the decommissioning.

### 1.  The Bankruptcy Agreements

ATP was still the operator of the Canyon Express properties and holder of the CEPS rights-of-way when it filed for bankruptcy.  Thus, for MOGUS to conduct the required Canyon Express decommissioning, it needed bankruptcy court approval to acquire the operating rights and CEPS rights-of-way from ATP.  To this end, MOGUS and ATP filed a Joint Motion in January 2014 asking the bankruptcy court "to approve the compromises and settlements" between them related to CEPS and MC 305.

The relevant agreements provided that ATP would designate MOGUS as the "operator" and "holder" of the Canyon Express properties; it would also contribute to an "Abandonment Fund," to be applied to ATP's share of the abandonment costs.  ATP would also assume the CEPS and MC 305 Agreements.  Finally, ATP would assign to MOGUS the CEPS rights-of-way and the physical CEPS assets.  In turn, MOGUS would withdraw its claims against ATP's estate, but it expressly reserved its rights to pursue claims for reimbursement against ATP's predecessors-in-title, including Total.

As part of the bankruptcy proceedings, ATP's secured creditors also created a new entity called Bennu Oil & Gas LLC ("Bennu").  Bennu

5

participated in the relevant bankruptcy agreements. It agreed to provide the overriding royalty interest (the "Royalty Interest")[3] that it held in the undeveloped MC 348 deep rights operated by Shell Oil Company ("Shell") in its Appomattox prospect, another oil prospect in the Gulf. Bennu split the Royalty Interest in half. It pledged the proceeds from one half of the Royalty Interest to the Abandonment Fund. It assigned the other half of the Royalty Interest directly to MOGUS.[4]

## 2. The Bankruptcy Court's Final Order

The bankruptcy court entered a Final Order approving the Joint Motion and authorizing ATP to execute the relevant agreements. The Final Order expressly reserved MOGUS's claims for reimbursement against ATP's predecessors-in-title and provided that the settlement would not in any way "extinguish" or "diminish" such claims, with the bankruptcy court noting that it was simply staying out of any dispute about those issues. After the bankruptcy court issued the Final Order, the government recognized MOGUS as operator of the Canyon Express leases and holder of the CEPS rights-of-way. The Bureau ordered abandonment of CEPS and MC 305.[5]

---

[3] "[A]n overriding royalty interest is a fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor." *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 436 (5th Cir. 2013) (brackets and emphasis omitted); *see also Royalty Interest*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining an "overriding royalty interest" as a "share of . . . revenue from production (free of the costs of production) carved out of a lessee's interest under an oil and-gas lease").

[4] At the time of the Joint Motion, MOGUS's parent company valued the entire Royalty Interest at $381 million. But as of these appeals, even though Shell has begun to develop and produce from its Appomattox prospect, no producing wells have been drilled on MC 348, the MC 348 lease has received no allocation of Appomattox production, and the Royalty Interest has produced no revenue for MOGUS or the Abandonment Fund.

[5] MOGUS also undertook abandonment of MC 348 and King's Peak.

## C.    Procedural History

### 1. *State Court Filings and Removal*

In August 2016, Total filed three separate lawsuits—one each for CEPS, MC 305, and MC 348—in Texas state court, seeking declaratory judgments that it was not liable for the abandonment costs.  MOGUS removed the cases to federal district court, where they were assigned to three different district judges, and filed counterclaims in each case.  MOGUS also moved to consolidate the three cases, but its motion was denied.

### 2. *Pretrial Proceedings*

In December 2017, MOGUS and Total filed cross-motions for summary judgment on liability in the MC 305 case.  They later filed similar cross-motions in the CEPS case.  On summary judgment, Total argued that it was not liable for decommissioning costs under the CEPS and MC 305 Agreements.  MOGUS argued that Total was liable for the decommissioning[6] costs.  Both courts found Total liable and granted partial summary judgment accordingly.  The CEPS court also granted a partial summary judgment on damages; the MC 305 court proceeded to a jury trial on that issue.  In connection with that trial, MOGUS argued in a motion in limine that evidence about the value of the Royalty Interest that Bennu contributed during ATP's bankruptcy, which Total argued should be subtracted from MOGUS's damages, should be excluded.  The MC 305 district court denied MOGUS's motion in relevant part, so the issues went to trial.

---

[6] We use the terms "decommissioning" and "abandonment" interchangeably throughout this opinion.

### 3. *The MC 305 Trial*

At trial, Total sought to reduce MOGUS's damages by the value of the Royalty Interest, which Total claimed was $11,417,000.  MOGUS, in turn, claimed it was entitled to a full 50% (i.e., Total's ownership interest in MC 305) of the decommissioning expenses, for a total of $33,066,395.36.

After Total closed its case, MOGUS sought judgment as a matter of law under Federal Rule of Civil Procedure 50(a) that the Royalty Interest did not affect MOGUS's damages.  The MC 305 court denied the motion and instructed the jury to consider "whether, and in what amount, MOGUS's damages should be reduced as a result of MOGUS's receipt of the [Royalty Interest]."

The jury then returned a verdict finding that MOGUS was entitled to $21,649,695.36 in damages.  This amount represented MOGUS's claimed damages minus what Total argued was the exact value of the Royalty Interest.

### 4. *The Final Judgments and Appeals*

Judgments in both cases were entered for MOGUS:  in the CEPS case, for $12,677,584.00 in damages, plus attorneys' fees, costs, and interest; in the MC 305 case, for $21,649,695.36 in damages, plus attorneys' fees, costs, and interest.

In the MC 305 district court, MOGUS again raised the Royalty Interest argument in a combined Rule 50(b) motion for judgment as a matter of law and Rule 59(e) motion to alter or amend the judgment.  MOGUS also argued for the first time that the Royalty Interest should have been apportioned among the relevant parties and properties.  The MC 305 district court summarily denied MOGUS's combined motion the day it was filed.

Total appealed both judgments.  MOGUS cross-appealed the MC 305 district court's (1) evidentiary rulings related to MOGUS's damages and (2) denial of MOGUS's renewed motion for judgment as a matter of law and

motion to alter or amend the judgment.  We later granted Total's motion to consolidate the appeals.

## II.   Jurisdiction, Situs of Relevant Law, and Standards of Review

The CEPS and MC 305 district courts had jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA") because the cases arose "out of, or in connection with" operations on the Shelf "involv[ing] exploration, development, or production of the minerals [or] of the subsoil and seabed of the . . . Shelf." 43 U.S.C. § 1349(b)(1).  We have jurisdiction over the parties' timely appeals from the district courts' final judgments.  28 U.S.C. § 1291.

"[F]ederal law governs actions under OCSLA to the extent that there is applicable federal law; however, if there is a gap in the federal law, the law of the adjacent state is used as a gap-filler and becomes surrogate federal law." *Bartholomew v. CNG Producing Co.*, 862 F.2d 555, 557 (5th Cir. 1989).  The district courts determined that Alabama is the state "adjacent" to CEPS and MC 305, so Alabama law applies in the absence of controlling federal law.  The parties do not dispute these rulings on appeal.

We review a district court's grant or denial of summary judgment de novo.  *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 745 (5th Cir. 2019). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  "When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Id.* (internal quotation marks and citation omitted).

We also review a district court's denial of a preserved argument in a Rule 50(b) motion for judgment as a matter of law "de novo, applying the same standard as the district court."  *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494

(5th Cir. 2019) (internal quotation marks and citation omitted). In so doing, "[w]e review all the evidence in the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party." *Encompass Office Sols., Inc. v. La. Health Serv. & Indem. Co.*, 919 F.3d 266, 273 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied sub nom. La. Health Serv. & Indem. Co. v. Encompass Office Sols.*, 140 S. Ct. 221 (2019).

## III.    Discussion

### A.    Whether Total Is Liable for a Share of the Decommissioning Costs Under the CEPS and MC 305 Agreements

We first consider whether Total is jointly and severally liable for the CEPS and MC 305 abandonment costs under the relevant Agreements. We hold that Total (1) is not liable for the CEPS abandonment costs but (2) is liable for its share of the MC 305 abandonment costs.

Both the CEPS and MC 305 district courts granted summary judgment for MOGUS on the liability issue, holding that Total was jointly and severally liable for its share of the decommissioning obligations. As it did in district court, Total asserts that its assignment of its interests in the Canyon Express properties to ATP relieved it of all liability for the abandonment costs.

The essential facts are not in dispute, so we interpret the relevant contractual provisions as a matter of law, focusing on the (different) texts of each contract. *Boudreaux v. Unionmutual Stock Life Ins. Co. of Am.*, 835 F.2d 121, 123 (5th Cir. 1988) (stating that the interpretation of an unambiguous contract presents a purely legal issue well suited for summary judgment); *Once Upon a Time, LLC v. Chappelle Props., LLC*, 209 So. 3d 1094, 1097 (Ala. 2016) ("If the court determines that the [contract] terms are unambiguous . . . then

the court . . . will enforce the contract as written." (internal quotation marks and citation omitted)).

Under Alabama law, "upon assignment of a right, the assignor's interest in that right is extinguished; however[,] upon the delegation of a contractual duty, the delegating party remains liable under the contract, unless the contract provides otherwise or there is a novation." *Indus. Dev. Bd. v. Russell*, 124 So. 3d 127, 135 (Ala. 2013). Based on the arguments in this case, the question is whether the language of the CEPS and MC 305 Agreements renders Total not liable for the decommissioning costs. *See Russell*, 124 So. 3d at 135. Because the contracts are differently worded, we address each separately and reach separate results.

### 1. *The CEPS Agreement*

Turning to the two relevant provisions in the CEPS Agreement, we note the key language in Article 11.3, which requires the Operator to conduct any required abandonment operations, explaining that the risks and proceeds are to be shared "by the Common System Owners based on the Common System Owner's Equity Interest *at the time of abandonment*" (emphasis added). Total argues that it was not a Common System Owner at the time of abandonment, so it is not liable for the decommissioning costs.

In response, MOGUS relies on the other key provision of the CEPS Agreement: Article 14.1, which states that a Common System Owner's assigning its interest does not release the assignor from obligations in the contract. Article 14.1 makes clear that obligations "created under" the CEPS Agreement "attributable to the period prior to the date of execution of the assignment" include "liability for abandonment" of CEPS.

The CEPS district court relied on Article 14.1 to conclude that Total was liable for all obligations that accrued before it assigned its ownership interest

11

to ATP.  But Article 14.1 does not address *when* those obligations accrued. More importantly, even if the decommissioning obligations did arise before Total's assignment, Article 11.3 still limits Total's liability to its "Equity Interest *at the time of abandonment*" (emphasis added).  Total had no Equity Interest in CEPS at the time of abandonment.  Under the plain text of Article 11.3, then, Total is liable for zero percent of the CEPS abandonment costs. Article 14.1 does not change that result.[7]

Accordingly, we conclude that the district court erred in granting summary judgment to MOGUS and denying summary judgment to Total.  We therefore REVERSE the judgment in appellate Case No. 19-20282 and RENDER judgment in Total's favor in that case.

## 2.  The MC 305 Agreement

Like the CEPS Agreement, the MC 305 Agreement contains two key provisions.  Article 24.1.4 governs assignment and tracks the language of the CEPS Agreement, mirroring that contract's Article 14.1.

Unlike the CEPS Agreement, however, the MC 305 Agreement does not limit an assignor's liability for abandonment costs to its ownership interest at the time of abandonment; it does not mirror the CEPS Agreement's Article 11.3. Instead, Article 18.4 of the MC 305 Agreement, which governs abandonment, states only that abandonment "[c]osts, risks and net proceeds will be shared by the Participating Parties . . . according to their Participating Interest Share."

---

[7] MOGUS cites several cases for the general rule that an assignor is still liable for its contractual obligations after assignment.  But none of those cases involved contractual language that based the assignor's obligations on its ownership interest "at the time of abandonment."  MOGUS's cited cases do not control the outcome here.

No Alabama case is directly on point.  Looking to states with similar laws,[8] we note that the Texas Supreme Court has interpreted similar language to mean that an assignor is liable for post-assignment expenses.  In *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, the contract at issue stated that abandonment "costs, risks, and net proceeds" would be "shared by the Parties owning [the abandoned] well or platform in proportion to their Participating interests." 207 S.W.3d 342, 346 (Tex. 2006).  Like Total, the assignor in *Seagull* argued that "its obligation to reimburse the operator continued only so long as it owned a participating interest." *Id.*  Applying Texas law, the Texas Supreme Court squarely rejected this argument.  *Id.*  It concluded that the assignor

> reads far too much into these provisions.  Nowhere do they mention the subject of release or the consequences which are to follow the assignment of a working interest. . . .  The operating agreement simply does not explain the consequences of an assignment of a working interest to a third party.

*Id.*  The Court thus held that "[b]ecause the operating agreement did not expressly provide that [the assignor's] obligations under the operating agreement should terminate upon assignment and [the operator] did not expressly release [the assignor] following the assignment of its working interest," the assignor remained liable for relevant abandonment costs even after it assigned its working interest. *Id.* at 347.

Unlike the CEPS Agreement, the MC 305 Agreement does not explain when the abandonment obligations are "created."  Thus, the key question is when the MC 305 abandonment obligations arose.  In the absence of any other indication, we note that federal regulations provide that such obligations

---

[8] Texas law, like Alabama law, generally tracks the common law in this area.  *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); RESTATEMENT (SECOND) OF CONTRACTS § 318 (1981); *Russell*, 124 So. 3d at 135 (citing RESTATEMENT § 318).

accrue when operators,[9] among other things, "[d]rill a well" or "[i]nstall a platform, pipeline, or other facility." 30 C.F.R. §§ 250.1701(c), 250.1702.

Total asserts that the regulations do not control here because they "govern the parties' joint and several liabilities *vis-à-vis the Government, not amongst themselves.*" *See Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 563 (5th Cir. 2003) (emphasis added). But the regulations still "provide definitions regarding when obligations accrue." *Nippon Oil Expl. U.S.A. Ltd. v. Murphy Expl. & Prod. Co. - USA*, No. 2:10-cv-02850-MVL-DEK, 2011 WL 2456358, at *4 (E.D. La. June 15, 2011).

Total argues that, contrary to the regulations, the MC 305 decommissioning obligations did not arise until the government ordered decommissioning. But Total cites no cases for this proposition. Indeed, Total cites no supporting cases *at all* in arguing that it is not liable for the MC 305 abandonment costs.

The underlying common law cases and relevant regulations, as well as the absence of contrary language in the contract, support MOGUS's argument. We thus conclude that the MC 305 abandonment obligations arose when Total drilled the wells on the property. Total is liable for its share of MC 305 abandonment costs under Articles 18.4 and 24.1.4 of the MC 305 Agreement. The district court did not err in granting summary judgment on this point.

**B.    Whether ATP Fully Satisfied the Abandonment Obligations**

Because we have concluded that Total is jointly and severally liable for the MC 305 abandonment obligations, we next consider whether ATP fully

---

[9] Technically, the regulations state that "lessees and owners of operating rights, as to facilities installed under the authority of a lease, and . . . right-of-way holders as to facilities installed under the authority of a right-of-way" accrue the obligations. *See* 30 C.F.R. § 250.1701(c). We use the term "operators" for simplicity.

satisfied those obligations when it settled with MOGUS.  We hold that it did not.

Having found that Total is jointly and severally liable for the abandonment obligations under the Agreements, it is not debatable that Total is a co-promisor with ATP.  *See* RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 293 cmt. a (1981). Total notes the general rule under the Restatement that satisfaction by one co-promisor relieves the others: the "one satisfaction" rule.  "Satisfaction by the acceptance of a substituted performance (§ 278) has the same effect, since the promisee . . . has a right only to the single performance or to an agreed equivalent."  *Id.* § 293 cmt. a.

But when an obligee reserves its rights against a co-promisor, Restatement § 295 becomes relevant.  Under Restatement § 295(2), "[w]ords which purport to release or discharge a promisor and also to reserve rights against other promisors of the same performance have the effect of a contract not to sue rather than a release or discharge."  That is, if *A* and *B* are co-promisors, and *A* settles with obligee *C*, but *C* reserves its rights against co-promisor *B*, then *A* and *C*'s settlement does not discharge *B* from liability.  *See id.*

Total claims that ATP fully satisfied the decommissioning obligations under § 293 when it settled with MOGUS during the bankruptcy proceedings.  MOGUS, in turn, relies on § 295.  MOGUS argues that the reservations of rights in the bankruptcy agreements and the Final Order mean that Total was not discharged from liability.  We address each argument in turn.

Total claims that during the bankruptcy proceedings, MOGUS accepted the consideration provided by ATP "in full satisfaction of ATP's obligation," relying on ATP's assumption of the MC 305 Agreement and ATP's entry into the agreements with MOGUS approved by the bankruptcy court.

No. 19-20271 c/w No. 19-20282

During the bankruptcy proceedings, ATP assumed the MC 305 Agreement pursuant to 11 U.S.C. § 365(a).[10] This meant assuming "both the obligations and the benefits of the executory contract." *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Tr. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 506 (5th Cir. 2000).[11] Total reads *National Gypsum* to mean that the assumption of a contract necessarily results in satisfaction of the obligations thereunder. Thus, Total contends, ATP's assumption of the MC 305 Agreement meant that any outstanding obligations under the Agreement were satisfied. But read in context, the *National Gypsum* language on which Total relies says only that "an executory contract may not be assumed in part and rejected in part." *Id.* It says nothing of the effect of assumption on outstanding obligations. Indeed, Total cites no case law holding that such assumption automatically results in satisfaction, nor have we discovered any.

Total next points to language in the relevant agreements regarding ATP's satisfaction of its obligations and confirming that the agreements involved a "satisfaction of the ATP Obligations."[12] Total argues that the provisions are "language of full satisfaction, not partial satisfaction." However, this argument overlooks the continued statements throughout the agreements that such satisfaction is between these two parties (ATP and MOGUS) only

---

[10] Under 11 U.S.C. § 365(a), a "trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

[11] An executory contract is one for which "performance remains due to some extent on both sides." *Tonry v. Hebert (In re Tonry)*, 724 F.2d 467, 468 (5th Cir. 1984) (internal quotation marks and citation omitted).

[12] The "ATP Obligations" were "ATP's respective proportionate share of the Decommissioning Obligations, inclusive of all associated operating, maintenance and repair expenses, insurance, and other costs and expenses incurred prior to or in connection with discharge of the Decommissioning Obligations." The "Decommissioning Obligations," in turn, were defined as "outstanding obligations for plugging and abandonment, removal, site clearance and/or decommissioning with regard to the Properties," including CEPS and MC 305.

and the fact that the key bankruptcy documents contained reservations of rights. Such reservations mean that Restatement § 295, not Restatement § 293, is the proper consideration.

Total argues that because ATP fully satisfied the abandonment obligations, § 295 does not control. But the case on which Total principally relies in arguing that ATP fully satisfied the abandonment obligations contains a key material difference: there was no reservation of rights. *See Holland v. United States*, 621 F.3d 1366, 1380–81 (Fed. Cir. 2010) (applying Illinois law). Moreover, unlike the agreements here, the *Holland* settlement agreement explicitly provided that the settling party's payment would "constitute *full* satisfaction of any and all remaining payments or contributions due or to become due under [the relevant agreements] . . . and . . . fully discharge the [settlor] . . . from any obligation or liability in connection therewith." *Id.* at 1372–73 (emphasis added). It also expressly released the settlor from "*any* obligation or liability of *any kind* in connection" with the settled claims. *Id.* at 1378. No such language exists in the relevant agreements here. ATP did not fully satisfy all abandonment obligations. Under Restatement § 295(2), Total remains liable for its share of the abandonment costs. The district court did not err in its ruling in this regard.

**C.    Whether the MC 305 District Court Erred in Allowing a Royalty Interest Setoff to Total's Liability**

MOGUS cross-appeals the MC 305 district court's denial of its Rule 50(b) motion for judgment as a matter of law on whether the Royalty Interest could be applied as a setoff to MOGUS's damages. We hold that MOGUS's cross-appeal fails.

Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court

No. 19-20271 c/w No. 19-20282

may . . . grant a motion for judgment as a matter of law" on that issue. FED. R. CIV. P. 50(a)(1). Where, as in this instance, the Rule 50(a) motion is not granted, "the movant may file a renewed motion for judgment as a matter of law." *Id.* 50(b).

Even a party appealing a district court's denial of a timely motion for judgment as a matter of law faces a high bar. *See Encompass Office Sols., Inc.*, 919 F.3d at 273 ("Although our review is *de novo*, after a jury trial, the standard of review is especially deferential." (internal quotation marks, citation, and brackets omitted)). But when a party fails to file a proper Rule 50(a) motion before filing a Rule 50(b) motion or raises a new argument in a Rule 50(b) motion, our case law is not entirely clear on the result, with some decisions concluding that we cannot consider such an appeal and some applying plain error review. *Compare OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 680 (5th Cir. 2016) ("We have held that a party cannot 'renew' a motion it never made."), *with Montano v. Orange Cty.*, 842 F.3d 865, 877 (5th Cir. 2016) (applying plain error review).[13] Because MOGUS cannot prevail even if we allow review, we need not address this dissonance further.

At trial, after Total closed its evidence, MOGUS moved for judgment as a matter of law under Rule 50(a). MOGUS argued that Total had not presented enough evidence to support its argument that it was entitled to a setoff in

---

[13] We also note that in most cases, "when a nonmovant fails, in district court, to object to a new issue's being raised in a Rule 50(b) motion . . . the new issue in the Rule 50(b) motion receives *de novo* appellate review." *Montano*, 842 F.3d at 877. This case presents the rare exception to that rule. Total did not respond to MOGUS's Rule 50(b) motion, but that is because it did not have a chance to do so: the MC 305 district court summarily denied the motion the day it was filed. We thus decline to review MOGUS's new argument de novo. *Cf. Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 248 (5th Cir. 2005) (applying de novo review when the nonmovant failed to object in the four days between the movant's filing the motion and the district court's ruling on it).

damages for the Royalty Interest. The MC 305 district court denied MOGUS's motion, as well as its renewed motion.

On cross-appeal, MOGUS first argues that Total was not entitled to a setoff because ATP and Bennu "never owed a 'joint obligation' to MOGUS." Under Alabama law, Bennu's payments decreased ATP's—and thus, Total's—liability to MOGUS only if Bennu and ATP had such a "joint obligation." *Ala. Farm Bureau Mut. Cas. Ins. Co. v. Williams*, 530 So. 2d 1371, 1373 (Ala. 1988) (holding that the parties did not undertake a joint obligation); *see also Har-Mar Collisions, Inc. v. Scottsdale Ins. Co.*, 212 So. 3d 892, 903 (Ala. 2016) (holding that a similar setoff was improper where the two insurers owed "separate and distinct" obligations to the insured).

MOGUS argues that Bennu and ATP were like the insurers in *Williams* and *Har-Mar*. But both cases are distinguishable. Unlike the insurers in those cases, here ATP and Bennu did not owe "separate and distinct" obligations. *See Har-Mar Collisions*, 212 So. 3d at 903. Rather, the evidence shows that both Bennu and ATP agreed to satisfy the ATP Obligations. One of the bankruptcy agreements provides that "ATP will satisfy the ATP Obligations . . . including through Bennu's participation in this Agreement with regard to the . . . [Royalty Interest]." Similarly, the Final Order stated that "all sums . . . received by MOGUS on account of the . . . [Royalty Interest] . . . shall be deemed and considered for all purposes to be expenditures made by ATP and/or on behalf of ATP, and shall constitute payment of a portion of ATP's share of Decommissioning."

Viewing the evidence in the light most favorable to Total, the MC 305 district court did not err in holding that ATP and Bennu were joint obligors such that the Royalty Interest decreased ATP's—and thus Total's—decommissioning liability. *See Encompass Office Sols., Inc.*, 919 F.3d at 273; *see also* RESTATEMENT § 295(3) ("Any consideration received by the obligee for

a contract not to sue one promisor discharges the duty of each other promisor of the same performance to the extent of the amount or value received.").

MOGUS next claims that allowing the Royalty Interest setoff is contrary to the Final Order in the bankruptcy case and the underlying bankruptcy agreements.  It points to reservation language in the Final Order stating that the order and the bankruptcy agreements would not affect MOGUS's right to seek payment from third parties for the decommissioning costs.  But that does not change the fact that actual contributions do offset the obligations of co-obligors.  RESTATEMENT § 295(3).

MOGUS also argues that Total's Royalty Interest evidence was too speculative to support the setoff.  MOGUS cites cases stating that royalty interests are inherently speculative.  *See Tidelands Royalty "B" Corp. v. Gulf Oil Corp.*, 804 F.2d 1344, 1350–52 (5th Cir. 1986) (stating that purchasing a royalty is a "gamble"); *see also Weaver v. Fla. Expl. Co.*, 608 So. 2d 1034, 1040 (La. Ct. App. 1992) (stating that a party was not entitled to damages for the royalty interest that was "without proof and . . . speculative and ha[d] not been proven with reasonable certainty").  But the issue in *Tidelands* was not whether a royalty interest's purported value was too speculative to support a jury finding on that question.  804 F.2d at 1347–48, 1350.  Moreover, the court in *Weaver* held only that evidence of the royalty interest in that case was speculative because the sole evidence of the royalty interest's value was the party's "own estimate of what the royalty interest [was] worth."  608 So. 2d at 1039–40.

MOGUS's contention fails, and *Weaver* is distinct, because Total presented evidence beyond its own estimate supporting the value of the Royalty Interest.  It introduced a MOGUS spreadsheet valuing the Royalty Interest at $11,417,000.  MOGUS's former chief operating officer testified at trial that this valuation represented the Royalty Interest's net present value.

In addition to this evidence, one of Total's vice presidents, who had experience valuing royalty interests, testified that he would recommend that Total pay at least $11.4 million for the $11,417,000 Royalty Interest.

MOGUS also argues that the Royalty Interest valuation was based only on "hypothetical ballpark" figures. But MOGUS is essentially asking us to reweigh the Royalty Interest evidence. That is something we will not do. *See Encompass Office Sols.*, 919 F.3d at 280.

Finally, MOGUS notes that Total received a setoff for the *full* amount of the Royalty Interest, even though MC 305 is only one of four properties that the Royalty Interest covered. It argues that Total did not present evidence showing how the Royalty Interest should be allocated among the different properties involved. Assuming arguendo that plain error review applies to this argument, which MOGUS raised for the first time in its Rule 50(b) renewed motion, "[i]f any evidence exists that supports the verdict, it will be upheld." *Montano*, 842 F.3d 877 (internal quotation marks and citation omitted).

There was at least some evidence that MOGUS received the Royalty Interest to compensate it for the cost of abandoning, among other properties, MC 305. MOGUS cites no precedent showing that Total was required to present evidence on how to apportion the Royalty Interest and thus decrease the setoff amount. The district court did not plainly err in rejecting MOGUS's apportionment argument. We thus will not reverse the district court's denial of MOGUS's Rule 50(b) motion.

## IV.  Conclusion

For the foregoing reasons, we REVERSE the CEPS district court's grant of summary judgment holding that Total is liable for the CEPS decommissioning costs and RENDER judgment in Total's favor under Case No. 19-20282 (District Court Case No. 4:16-cv-02671). We AFFIRM the MC 305

No. 19-20271 c/w No. 19-20282

district court's judgment in full under Case No. 19-20271 (District Court Case No. 4:16-cv-02674).